```
                                              ┌─────────────────────────────────┐
                                              │ USDC SDNY                       │
                                              │ DOCUMENT                        │
UNITED STATES DISTRICT COURT                  │ ELECTRONICALLY FILED            │
SOUTHERN DISTRICT OF NEW YORK                 │ DOC #: _____        │
-------------------------------------------- X│ DATE FILED: 03/25/2014          │
                                              └─────────────────────────────────┘
```

-------------------------------------------- X

AXIOM CAPITAL MANAGEMENT, INC.,     :

        :

        Plaintiff,     :      12 Civ. 8967 (KBF)

        :

        -v-     :      OPINION & ORDER

        :

ORACLE MINING CORPORATION,     :

        :

        Defendant.     :

        :

-------------------------------------------- X

KATHERINE B. FORREST, District Judge:

On February 17, 2012, Axiom Capital Management, Inc. ("Axiom") signed a contract ("the Agreement") with Oracle Mining Corp. ("Oracle") to assist Oracle with raising financing for its Oracle Ridge Copper Project. The dispute giving rise to this lawsuit concerns whether Oracle owes Axiom payment for a financial arrangement entered into with the private equity firm Red Kite Management ("Red Kite") in November 2012. The resolution of this dispute turns on the interpretation of the contract between the parties.

In December 2012, Axiom filed this lawsuit asserting claims for breach of contract (first and second claims for relief), unjust enrichment (third claim for relief), quantum meruit (fourth claim for relief), and declaratory judgment (fifth claim for relief). (ECF No. 1 ¶¶ 24–52.) Oracle answered and counter-claimed for a variety of declarations as to the same issues in its favor. (ECF No. 61 ¶¶ 53–127.) This Court previously denied Oracle's motion for summary judgment on the basis

that the record before the Court at that time rendered what ought otherwise to be a straightforward phrase ("introductions to") ambiguous.  (ECF No. 48 at 3.)  Based on the evidence presented on that motion, it was unclear whether the contract used the phrase "introductions to" with reference to Oracle as a company, or whether it instead meant "introductions to" Oracle's particular financial offering.  (Id.)  In particular, the preamble of the Agreement, when read in combination with section (A)(1) of the Agreement, rendered ambiguous that which would otherwise have been easily and speedily resolved.

This Court held a bench trial on January 28, 29, and 30, 2014.  At that trial, Mark Martino, President of Axiom, and three of Axiom's Managing Directors, Daniela Bendor, Harvey Stober, and Lincoln Crichlow, testified by declaration on direct and were cross-examined live.  In addition, Oracle's Alexander Langer (a former Oracle employee), Jason Mercier (Oracle's Senior Vice President and Corporate Secretary), Paul Eagland (Oracle's former CEO, former Chairman of the Board and director), and Gregory K. Liller (an Oracle board member), also testified by declaration on direct and were cross-examined live.  Finally, the Court also heard from Douglas Silver of Red Kite.  The Court also received into evidence deposition testimony designated by the parties from Oskar Lenowski, CEO of Red Kite, and Barry Feldman, a trader from Oracle, and several dozen documentary exhibits and digital copies of recorded telephone calls.

This Opinion & Order constitutes the Court's findings of fact and conclusions of law.  For the reasons set forth below, the Court finds in favor of Oracle as to all

claims.  Judgment is therefore entered by separate order for Oracle.  Each party

shall bear its own costs.

I.      FINDINGS OF FACT

In February 2010, Paul Eagland, Gregory K. Liller, and others purchased the

Oracle Ridge Mine. (Trial Decl. of Paul Eagland ("Eagland Decl."), Court Ex. 6, at ¶

6, at ECF No. 62.)[1]  Later that year, Goldhawk Resources, now known as Oracle

Mining Corp., acquired the Oracle Ridge Mine.  (Id.)  Eagland was the CEO of

Oracle for a period commencing in October 2011, and later served as the Executive

Chairman of Oracle's Board of Directors, and as a board member until November

2013.  (Id. ¶¶ 6, 7.)

During late 2011 and early 2012, Oracle was considering a public offering of

securities.  (Trial Decl. of Alexander Langer ("Langer Decl."), Court Ex. 4, at ¶ 21,

ECF No. 63.)  This offering was never completed.  (See Trial Tr. 74:22–75:01,

142:04–142:10, ECF Nos. 82, 84, 86.)

In May 2011, a representative of Red Kite, Robert Loewen, contacted Oracle's

then-CEO, Kevin Drover, concerning a potential Red Kite investment in Oracle.

(Eagland Decl. ¶ 14; Trial Decl. of Gregory K. Liller ("Liller Decl."), Court Ex. 9, at ¶

13, ECF No. 64; DX03.)  During that initial communication, Red Kite stated that it

---

[1] The Court accepted the declarations of each of the live witnesses as their direct trial testimony and provided for live cross and re-direct.  Prior to the witness taking the stand, the Court provided each side an opportunity to assert any objections that it deemed appropriate to the testimony as set forth in the declarations; the Court then issued its rulings with respect to the asserted objections.  In a limited number of instances, the development of certain points during trial resulted in a modification of the Court's original ruling.

was in the process of creating a fund called "Mine Finance II" ("MF II"), which would also provide equity financing.  (Id.)

In September 2011, Alexander Langer, Oracle's then-Vice-President of Capital Markets, was in London for "London Metals Exchange Week."  (Langer Decl. ¶ 5.)  During that week, Mark Forsyth, an Oracle director, introduced Langer to Andrew Wilson, the Director of Institutional Equity Sales at Haywood Securities (U.K.).  (Id. ¶ 6.)  Over the course of several additional social events that week, Langer and Wilson discussed procuring equity financing for Oracle.  (Id.)

On October 9, 2011, Mark Forsyth, a director of Oracle, communicated with Red Kite's trader, Barry Feldman, regarding a possible Red Kite investment in Oracle.  (Eagland Decl. ¶ 15; Trial Decl. of Douglas Silver ("Silver Decl."), Court Ex. 8, at ¶ 15, ECF No. 66; DX04.)  Silver recalls that Forsyth again raised the possibility of a Red Kite investment in Oracle during a conference call later in October 2011.  (Silver Decl. ¶ 17; DX06.)  In November 2011, Forsyth suggested to Eagland that Oracle approach Red Kite for financing.  (Eagland Decl. ¶ 15.)  Eagland agreed.  (Id.)  Liller supported working with Red Kite; he believed that an investment by that firm would make Oracle more attractive to other potential investors.  (Liller Decl. ¶ 14.)

In November 2011, Wilson of Haywood Securities introduced Oracle's Alexander Langer to Red Kite's Grant Gilmour.  (Eagland Decl. ¶ 16; Langer Decl. ¶ 7; Silver Decl. ¶ 18; DX08, at RK-00000006.)   Langer shared Oracle's "corporate presentation" with Gilmour.  (Langer Decl. ¶¶ 8, 9; DX07, at RK-00001796.)  That

presentation contained information regarding, <u>inter alia</u>, Oracle's plan to have "minimal long term debt." (<u>Id.</u> at RK-00001818.) Gilmour and Langer scheduled a call for the following week that would include Eagland. (Langer Decl. ¶¶ 10, 11.) During that call, Eagland, Langer, and Gilmour spoke for over an hour about Oracle's financing needs, including the fact that Oracle preferred equity financing to other types of financing. (Eagland Decl. ¶ 17; Langer Decl. ¶ 11.) During that call, Gilmour discussed Red Kite's interest in various forms of financing, including debt, equity, royalties, offtakes, and streaming deals. (Eagland Decl. ¶ 17; Langer Decl. ¶ 11.) Oracle and Red Kite had another conference call on December 12, 2011, during which they discussed, <u>inter alia</u>, the types of ores Oracle expected from the mine. (Silver Decl. ¶ 19; DX06.)

In late 2011, Oracle was in discussions with Credit Suisse regarding a $70 million credit facility. (Eagland Decl. ¶ 9; Trial Declaration of Jason Mercier ("Mercier Decl."), Court Ex. 7, at ¶ 17, ECF No. 65.) The parties signed a term sheet in late February 2012. (Eagland Decl. ¶ 9; Mercier Decl. ¶ 17.) Oracle was also in discussions with two other companies, Glencore and Trafigura, regarding debt and "offtake" financing[2] during the same period. (Eagland Decl. ¶ 9.) Oracle was also seeking equity investment. (<u>Id.</u> ¶ 10.) Eagland was more interested in equity than debt financing; debt financing must be repaid by a date certain, irrespective of when the mine becomes productive. (<u>Id.</u>) In contrast, equity provides a cash infusion that does not need to be repaid. (<u>Id.</u> ¶ 11.) In mining,

---

[2] "Offtake" financing refers to payment in kind based on output from the mine. (Eagland Decl. ¶ 12.)

offtake and royalty arrangements, which provide for payment in the form of output once the mine is productive, are additional methods of financing.  (Id. ¶ 12.)

In January 2012, Langer received an email from Red Kite's Douglas Silver suggesting a mine visit, and informed Eagland that Silver would visit the Oracle mine in February 2012.  (Id. ¶ 18; Langer Decl. ¶ 13; Liller Decl. ¶ 15; DX12.) Langer was subsequently involved details relating to Silver's visit. (Langer Decl. ¶¶ 16, 17.)  Eagland had first met Silver in the 1980s; while he had not communicated with Silver since the 1980s, Eagland advised Langer that Silver would see the value in the mine.  (Eagland Decl. ¶ 18.)  Silver confirmed that he had worked with Eagland in the 1980s.  (Silver Decl. ¶ 5.)

Separately, by mid-January 2012, Liller was in regular telephonic communication with Eagland about a potential investment by Red Kite.  (Liller Decl. ¶ 16.)  Prior to Silver's mine visit, Liller met at length with Luis Saenz, Oracle's chief geologist and the individual who would be conducting the tour.  (Liller Decl. ¶¶ 17–19.)  Liller discussed project data, including technical matters and financial information, such as expected capital expenditures for infrastructure needs and the status of financing, with Saenz.  (Id. ¶ 19.)

Langer had known Axiom's Lincoln Crichlow since he had worked at a previous job.  (Langer Decl. ¶ 23.)  At the beginning of 2012, Crichlow, who had just started working at Axiom, reached out to Oracle to assist it with finding investors. (Id.)  Bendor, Crichlow, and Carl Bronstein of Axiom met with Mercier of Oracle in January 2012.  (Trial Decl. of Daniela Bendor ("Bendor Decl."), Court Ex. 2, at ¶ 6,

ECF No. 92.)  Crichlow represented to Mercier that Axiom was heavily focused on and had significant contacts in the mining sector.  (Mercier Decl. ¶ 19.)  The Axiom team continued to have conversations with Oracle about working together.  (Bendor Decl. ¶ 7.)  In mid-February, Langer and Mercier discussed Oracle's requirements with Axiom.  (Mercier Decl. ¶ 20.)  In particular, Mercier and Langer explained to Bendor that Oracle wanted to reach out to new potential investors.  (Id.)  Axiom stated that they could expand Oracle's U.S.-based contacts.  (Id.)

In early February 2012, Langer met with Gilmour in South Africa; Langer confirmed that everything was in order for Silver's mine visit later that month. (Langer Decl. ¶ 18.)

On February 17, 2012, Bendor provided Langer and Mercier with a proposal that stated that Axiom's goal was "to increase Oracle's investor base."  (Mercier Decl. ¶ 21; PX8, at ACM000058; DX15, at ACM000058.)  At the time, Bendor understood that Oracle was in the process of selecting a lead banker for the planned offering.  (Bendor Decl. ¶¶ 7, 10.)  She viewed the Agreement as temporary, pending selection of a lead bank and execution of a more extensive bank syndication agreement.  (Id. ¶¶ 10, 11; PX10, at ACM001469.)

Langer reviewed every draft of the Agreement that Axiom presented to Oracle.  (Langer Decl. ¶ 26.)  He testified that the "introduction" language in the preamble of the Agreement was included at the specific request of Oracle and that it was very important to Oracle.  (Id. ¶¶ 29, 30; Tr. 289:09–18, 323:22–24; DX21, at ACM000121.) Langer stated that one of the key points of the Agreement for Oracle

was the "introduction" language.  (Tr. 289, 291.)  He further testified that the addition of the "introduction to" language in the preamble was to "reaffirm that introduction point."  (Tr. 291:11.)

The "introduction to" language is standard in finder's fee agreements.  (Tr. 324:08–10; 574:10–575:06.)  Langer understood that an "introduction to" the Company meant an initial introduction; he had never used the term in any other way.  (Tr. 299:03–07, 323:22–325:07.)  Langer also understood the agreement between Oracle and Axiom to provide for payment to Axiom of a fee if it made an initial introduction to Oracle of an investor that purchased securities in Oracle.  (Tr. 297:15–299:07; Langer Decl. ¶ 31.)  Langer did not view Red Kite as a new introduction to Oracle, because Oracle had a prior relationship with Red Kite. (Tr. 322:25–323:04, 328:15–18; Langer Decl. ¶ 32.)  Langer communicated his understanding of the "introduction to" language to Bendor, Crichlow and Bronstein.[3]  (Tr. 298:05–300:23.)

Mercier reviewed each draft of the Agreement before it was executed. (Mercier Decl. ¶¶ 24–26.) He understood and intended that Axiom would only be paid in the event that it introduced a new investor to Oracle that purchased securities in Oracle.  (Mercier Decl. ¶ 27; Tr. 574:10–575:16.)

---

[3] Langer is no longer with Oracle; he is with a company that has no client relationship with Oracle. He traveled from Vancouver, Canada to testify voluntarily because he believed it was the "right thing to do."  (Tr. 325:08–18.)  Notably, he did this at some personal risk, since his wife was due to have their child within a very short time.  (Tr. 325:13.)  The Court found Langer very knowledgeable and credible.  He was forthcoming, not evasive, and his testimony was appropriately detailed.  His testimony, almost more than any other, provided a coherent and logical presentation of the facts.

Bendor drafted the initial version of the Agreement. (Tr. 97:12–15; see also Bendor Decl. ¶ 10; Mercier Decl. ¶ 23.) She had only recently joined Axiom and had no prior experience on mine deals. (Tr. 85:07–86:09; Bendor Decl. ¶ 4.) She had never before been involved in an engagement in which she was hired to act as a finder and not as a placement agent. (Tr. 100:08–21.) She cut-and-pasted the phrase "If, as a result of the introduction(s) made by or through Axiom to Company" from another engagement letter that someone else at Axiom had previously drafted. (Tr. 112:21–113:22; 114:04–07.) She did not have any communications with anyone at Axiom regarding the language of the Agreement. (Tr. 114:08–16.) Bendor assumed that the "introduction" language was "regular placement" agent language. (Tr. 114:12–13.)

Like Langer, Bendor testified that Oracle requested the insertion of the phrase "introduced by the Placement Agent" in the first sentence of the preamble. (Tr. 117:15–118:11; Bendor Decl. ¶ 13; see also DX21.) Oracle's proposed changes were made to the Agreement. (DX01, at OMC-00494.)

Every version of the Agreement states that it is "non-exclusive." (DX17, at OMC-000480; DX19, at ACM000100; DX20, at ACM00110; DX21, at ACM000119; DX22, at ACM000131; DX23, at ACM000143.) Every version of the Agreement states that Axiom would be paid for investors or purchasers "whom Axiom had introduced to the Company." (DX17, at OMC-000481; DX19, at ACM000101; DX20, at ACM000111; DX21, at ACM000120; DX22, at ACM000132; DX23, at ACM000144.) Other members of the Axiom team, including Harvey Stober, a

Managing Director of investment banking, and Lincoln A. Crichlow, also a

Managing Director, played no role in drafting the Agreement. (Tr. 340; Trial

Declaration of Harvey S. Stober ("Stober Decl."), Court Ex. 5, at ¶ 5, ECF No. 94;

Trial Declaration of Lincoln A. Crichlow ("Crichlow Decl."), Court Ex. 3, at ¶ 9, ECF

No. 93.)

>   The Agreement provides as follows:

>   This letter (the "Agreement") constitutes the agreement between Oracle
>   Mining Corp., a Canadian corporation (the "Company") and Axiom Capital
>   Management, Inc. ("Axiom" or the "Placement Agent") whereby Axiom has
>   agreed to serve as a placement agent for the Company, on a non-exclusive
>   and "best efforts" basis, in connection with the proposed offer and private
>   placement (the "Offering" or "Private Placement") by the Company of the
>   Company's securities which may be comprised of senior debt, preferred stock,
>   convertible notes, common stock, and warrants in any combination . . . (the
>   "Securities") to accredited investors introduced by the Placement Agent . . . .
>   This agreement shall exist for a period of 120 days . . . . It is agreed that
>   Oracle will enable Axiom to place a minimum of five million dollars
>   ($5,000,000) . . . . If, as a result of the introduction(s) made by or through
>   Axiom to Company all or any part of an Offering is consummated by the
>   Company with a Purchaser, then Company shall owe to Axiom Private
>   Placement Fees as outlined in Section A-1 below. . . .

>   A.  Fees and Expenses. . . .

>>   1.  Private Placement Fee.  As compensation for its services in connection
>>   with the Private Placement, the Company shall pay to Axiom a cash
>>   placement fee equal to six [sic] [percent] (6.0%) of the aggregate
>>   purchase price paid by each Purchaser of Securities that were sold in
>>   the Offering . . . .

>>   . . .

>>   4.  Fee Tail; Axiom shall be entitled to a Placement Agent's Fee . . . with
>>   respect to any securities purchased in any subsequent offering
>>   ("Subsequent Offering") by Purchasers whom Axiom had introduced to
>>   the Company during the Term . . . .

> B. Non-Circumvent.  The Company hereby irrevocably agrees not to circumvent, avoid, bypass, or obviate, directly or indirectly, the intent of this Agreement . . . .

(DX01, at OMC-000494–OMC-000495.)

Mark D. Martino, President of Axiom, and Eagland of Oracle approved and executed the Agreement. (Tr. 57:02–58:04; DX1.) Martino testified that he approved the language "If, as a result of the introduction made by or through Axiom to Company." (Tr. 57:23–58:04.)  However, he did not know whether that language came out of an Axiom standard form agreement.  (Tr. 58:05–16.)  Martino was not involved in the negotiations of the Agreement, and whatever provisions were in the Agreement were conveyed to him through Bendor.  (Tr. 59:03–05.)  He did not recall any conversations with Bendor regarding the "introduction" language contained in the Agreement.  (Tr. 61:02–15.)[4]

Martino testified that a "finder's fee" agreement is a "referral type of an agreement, where you either introduce a potential investor to a transaction or you introduce a deal to another investment bank, [and you are] paid a finder's fee for making a referral." (Tr. 63:24–64:04.)  In contrast, a "placement agent agreement is really an investment banking agreement, where you're involved with every aspect of the transaction from working with the company on their presentation to potential investors , soliciting potential investors, conducting a due diligence process, addressing questions, negotiating the transaction, negotiating terms, acting as an intermediary between an investor and the client company so that you can close a

---

[4] Martino testified that Bendor's experience was primarily in the high-tech sector and that she had never before been engaged in raising financing for a mine.  (Tr. 51:19–24.)

financing." (Tr. 64:04–12.)  Martino agreed that a typical placement agent agreement would ordinarily contain a confidentiality provision and that a finder's fee agreement would not.  (Tr. 64:13–65:15.)  The Agreement executed between Axiom and Oracle did not contain such a provision.  (See DX1.)  The Agreement is consistent with what Martino described as a finder's fee agreement.[5]

Oracle's Langer testified similarly with respect to the differences between finder's fee and placement agent agreements.  (Tr. 255:10–25.)  He had prior personal experience with finder's fee agreements, unlike Bendor.  (Tr. 297:21–298:04.)  Finder's fee agreements were generally two to three pages, of similar length to the Axiom-Oracle Agreement.  (Tr. 255:19.)  In contrast, private placement agreements can run 20 pages or more in length.  (Tr. 255:20–21.)  Langer testified that it was consistent with a finder's fee agreement to have the finder play some role in transmitting due diligence information; the interest of the finder was still to see the transaction close, even if their involvement was not as in-depth as that of a placement agent.  (See, e.g., Tr. 264:17–265:02.)

Martino testified that he did not expect that Oracle would provide Axiom with a list of investors that Haywood Securities had separately introduced to

---

[5] On re-direct, Martino was asked to clarify what he meant by "find" as he had used that word on cross.  (Tr. 83:09–10.)  He testified that he meant "find as an investment banker, as a placement agent to find investors who we would then negotiate with to have invest into the Oracle transaction." (Tr. 83:11–13.) The Court does not credit this testimony.  It was clear on cross what counsel was asking.  The distinction between a "finder" and a true placement agent had been made explicit; the Court takes Martino's answer that Axiom was hired as a "finder" to be an accurate statement as to what he actually viewed as Axiom's role.  Moreover, that role is consistent with the form of agreement and the tasks that Axiom undertook (apart from those areas into which it inserted itself without a formal mandate, as described below).

Oracle.  (Tr. 75:02–06.)  The record is clear that Haywood Securities in fact introduced Red Kite to Oracle.

      Once Oracle had engaged Axiom, Stober for Axiom informed Bendor that he knew a New York City-based principal of Red Kite.  (Bendor Decl. ¶ 17; Stober Decl. ¶ 7.)  Bendor believed that Red Kite would require an offtake agreement as part of any financing.  (Bendor Decl. ¶ 17.)  Not knowing whether Oracle would be interested in such an arrangement, she called Eagland and stated that Axiom had a contact with Red Kite whom Axiom intended to call, but asked whether Eagland would be open to an offtake agreement.  (Id. ¶ 18.)  Eagland responded that he would.  (Id.)  He did not inform Bendor that she should not contact Red Kite; nor did he inform her that Oracle would not pay Axiom for any investment by Red Kite in light of the prior Oracle-Red Kite relationship.  (Id. ¶ 19.)  Bendor testified that Eagland never objected to Axiom's involvement on telephone calls or meetings with Red Kite.  (Tr. 104:10–19.)

      On February 23, 2012, Stober called Oskar Lewnowski of Red Kite.  (Stober Decl. ¶ 8.)  Lewnowski recalls that Stober communicated with him but recalls little about the communication. (Lewnowski Dep. Designation 72:15–79:09.)  Lewnowski does not recall having more than one conversation with Stober, nor does he recall being particularly interested in what Stober was communicating to him; he testified that this part of the investment process was in Silver's domain.  (Id. 78:02–07.)

      Silver of Red Kite visited the Oracle Ridge Mine on February 22, 2012.  (Silver Decl. ¶ 24.)  Luis Saenz, Oracle's senior geologist, conducted the tour.  (Id.)

They discussed technical aspects of the mine, including how the resources in the mine were measured, Oracle's proposed processing method, its infrastructure needs, its expected capital costs and capital plans, the mine's expected output, and Oracle's expectations with regard to weather, labor, permitting and timing.  (Id.)  They also discussed financing needs.  (Id.)  On that same day, Silver also visited with Oracle's executive Doug Nicholson.  (Id. ¶ 25.)  Following that visit, Silver created a "project profile" for Oracle, compiling all of the available information for the mine into one document for, inter alia, ease of reference when negotiating and drafting a term sheet.  (Id. ¶ 27.)

On either February 23 or 24, Stober called Silver.  (Stober Decl. ¶ 9.)  Silver advised Stober that he was already familiar with Oracle and in fact had already visited the mine.  (Id.)  Stober states in his trial declaration—but the Court does not find credible—that he raised for the first time with Silver the possibility of Red Kite doing equity financing with Oracle.  (Id.)[6]  This is inconsistent with the weight of the credible documentary, declaration, and oral testimony that Oracle and Red Kite had communicated about the possibility of equity financing in the fall of 2011.

On February 24, 2012, Silver then spoke with Oracle's Vice President of Operations, Vic Rozon, concerning metallurgy and infrastructure costs, capital expenditures, equipment, permitting, and timing for a new budget and cash-flow model.  (Silver Decl. ¶ 26; DX6, at RK-00012624.)

---

[6] The Court generally found Stober to lack credibility.  His live testimony seemed designed to provide the "right" answer rather than a true recitation of what occurred when; he was argumentative at times when it was unnecessary and seemed generally overly defensive.

On February 23 and 24, 2012, Oracle personnel attended meetings with various potential investors (not including Red Kite) in New York City.  (Bendor Decl. ¶ 15.)

On February 27, 2012, Bendor sent Oracle a proposed amendment to the Agreement.  (Bendor Decl. ¶ 20; DX26, at ACM000167; PX22, at ACM000167.)  She testified at trial that the text of the proposed amendment reflected the parties' understanding of their arrangement, with the addition that Oracle agreed to hire Axiom on an exclusive basis in the United States.  (Tr. 134:06–14.)  The text of the proposed amendment states that the company had agreed to hire Axiom "for finding U.S.-based investors."  (Tr. 134:15–16.)  Oracle did not execute the amendment.  (See Bendor Decl. ¶ 21.)  Mercier stated that he had never agreed to make the change from non-exclusive to exclusive.  (Mercier Decl. ¶ 32.)  When Martino, Axiom's President, was shown the proposed amendment at trial, he testified that, putting aside the exclusivity language, the remainder conformed to his understanding of the arrangement between Axiom and Oracle, and that "we were hired by the company to find investors."  (Tr. 66:23–68:05.)

On February 29, 2012, Mercier and Oracle's Chief Financial Officer, Carlos Escribano, spoke with Silver of Red Kite.  (Mercier Decl. ¶ 35; Silver Decl. ¶ 28.)  Silver stated that he had visited the mine and was interested in financing the project.  (Mercier Decl. ¶ 36.)  Because of that call, Silver understood that Oracle was in the middle of permitting, did not yet have institutional investors, and was looking for funding by mid-year.  (Silver Decl. ¶ 28.)

15

In March 2012, employees of Oracle were going to be in Denver, Colorado. (Bendor Decl. ¶ 23.)  They asked Axiom if Axiom had any investors with whom they should meet while they were there.  (Id.)  On March 12, 2012, Bendor emailed Jason Mercier and Langer of Oracle and asked whether Oracle could meet with Red Kite the next day.  (Langer Decl. p. 8, at ¶ 1.)  At the time that Bendor suggested this meeting, she knew that Oracle and Red Kite had had prior communications and that Red Kite had in fact visited the mine.  (Tr. 107:13–16.)  Crichlow also knew that Oracle and Red Kite had had communications prior to this time and that Red Kite had visited the mine.  (Tr. 186:21–188:16.)  Crichlow knew that among the prior communications between Red Kite and Oracle was one that involved Oracle's CFO. (Tr. 186:24–187:03.)  Mercier was disappointed because he had wanted Axiom to introduce Oracle to new potential investors, not those with whom they had already been in communication. (Mercier Decl. ¶ 40; see also Tr. 612:14–613:11.)  Mercier replied to Bendor "straight away" that he and the CFO had previously spoken with someone from Red Kite, and asked how the meeting "was positioned." (Mercier Decl. ¶ 41; Langer Decl. p. 8 ¶ 2; DX27, at OMC-000029.)

Langer received a copy of the email communication between Bendor and Mercier, and he reiterated that he had had Silver "on site" (i.e., at the mine) two weeks prior.  (Langer Decl. p. 8 ¶ 4; Mercier Decl. ¶ 42; DX27, at OMC-000028; PX34, at OMC-000028.)  Langer testified that when he made this statement by email, he intended to convey that Oracle had a preexisting relationship with Red Kite—and that, by extension, that there was no room for Axiom to obtain a fee from

any Red Kite investment.  (Tr. 311:05–15.)  In the overall context of the Agreement, including the timing and the clarity of this statement of prior involvement with Red Kite, the Court agrees that this communication from Langer indicated that Axiom would not be able to obtain a finder's fee.

During the same email communication relating to the meeting in Denver, Bendor indicated that she knew that Silver had already visited the mine.  (PX34, at OMC-000028; DX27, at OMC-000028; Mercier Decl. 43.)  Red Kite and Oracle met on March 13, 2012 in Denver; no Axiom personnel were present at that meeting.  (Bendor Decl. ¶ 23.)  Among the attendees at that meeting were Silver and Saenz, who had spent the day together just a few weeks before at the mine.  (Silver Decl. ¶ 29.)

In connection with setting up the March 13 meeting, Stober asked Eagland whether Oracle would be interested in an offtake agreement with Red Kite; Eagland responded via email that he welcomed Silver's interest.  (PX 35.)  At trial, Stober testified that Eagland sent this email welcoming Silver's interest in response to a voicemail message that he had left for Eagland the previous evening in which he had asked about the offtake, but also asked whether it was "okay" for Axiom to pursue this client.  (Tr. 361:23–62:06.)  Stober characterized his voicemail as equivalent to asking Eagland for confirmation that Red Kite was not outside of the Axiom-Oracle Agreement.  (Tr. 362:05–06.)

Eagland testified that at that time he did not think that Red Kite was an investor with respect to whom Axiom could earn a fee.  (Tr. 458:03–05.)  He testified

17

that Red Kite was "outside the confines of its agreement." (Tr. 458:08.)  The Court does not find that Stober included such a request for confirmation that Red Kite was included within the Agreement in his voicemail message.  In any event, it is clear that Eagland's response did no more than state that he welcomed Red Kite's interest; there is no reassurance or promise regarding whether Axiom's contractual arrangement with Oracle covers any investment by Red Kite.

Following the meeting, Mercier discussed the meeting with Bendor.  (Bendor Decl. ¶ 24.)  Mercier thought that Axiom, as part of its new relationship with Oracle, was eager to please, and that that was the reason they were trying to assist with a relationship for which they could not be paid.  (Mercier Decl. ¶ 45.)  Mercier also believed that an investment by Red Kite would be to Axiom's advantage in attempting to get other investors on board.  (Id.; Tr. 618:15–19.)  Langer testified similarly: he believed that an investment by Red Kite to assist Axiom in finding other investors would be "like a stamp of approval" from a fund that was known to be heavily mine-focused.  (Tr. 302:22–303:05.)[7]

Axiom scheduled additional meetings with other potential investors during the latter part of March and into April 2012.  (Bendor Decl. ¶ 25.)  None of the entities with whom Axiom and Oracle had these meetings made an investment.  (See Bendor Decl. ¶ 25; see also Tr. 491:15–18, 494:08–496:15.)  Axiom also

---

[7] At various points, Axiom appeared to be arguing that, taken together, the Credit Suisse credit facility of $70 million and the Red Kite investment of $38 million would have met all of Oracle's needs, leaving no room for any additional investor that Axiom might locate.  (See, e.g., 304:11–305:01.)  This is mathematically and substantively incorrect. Langer testified that Oracle needed $100 million total.  (Tr. 304:11–14.)  The Credit Suisse debt facility was a draw-down facility with no committed schedule; indeed, it was only at a term sheet stage.  (Tr. 304:02–305:20.)  There was still, therefore, plenty of room for additional equity investors.  (Tr. 305:24 –306:14.)

maintained a database of potential investors but, despite various telephone calls and meetings, none panned out.  (Bendor Decl. ¶¶ 35, 36; PX190, PX191, PX192; Crichlow Decl. ¶¶ 23–26.)

On March 14, 2012, Silver sent a draft confidentiality agreement to Oracle. (Silver Decl. ¶ 30.)  On March 20, 2012, Oracle and Red Kite entered into a confidentiality agreement.  (Id.; PX42.)  Axiom played no role in the negotiation or execution of this agreement.  (Mercier Decl. ¶ 46.)  A month later, Bendor requested that Mercier send her a copy of the confidentiality agreement for what she described as "compliance reasons."  (Id.; DX31, at ACM000887.)  Mercier stated that he did not understand why she needed a copy and in his cover email stated that he had never heard of that type of "compliance" request before.  (Id.)

In early April, Axiom learned that Red Kite had not yet received certain financial information.  (Bendor Decl. ¶ 26.)  Mercier told Bendor that he would arrange a call with Oracle, but Bendor insisted that she arrange it.  (Mercier Decl. ¶ 48.)  The call between Oracle and Red Kite occurred on April 10, 2012; Bendor was on the call, as was Crichlow (though he was not announced).  (Mercier Decl. ¶ 47.) Unbeknownst to Oracle or Red Kite, and for reasons never explained at trial, Crichlow recorded that call.  (Id.; Silver Decl. ¶ 31; Crichlow Decl. ¶ 11; PX 184.)[8] Mercier believed that Axiom was on the call because Axiom hoped that Red Kite would make an investment in Oracle and thereby draw other investors to Oracle. (Mercier Decl. ¶ 49.)

---

[8] Crichlow also recorded two other calls with Oracle, both in February 2012.  (PX180, PX186.) Crichlow stated that he made these recordings for his own future reference only. (Crichlow Decl. ¶ 15.)

The recording of the April 10 call between Oracle and Red Kite was played at trial.  The Court was therefore able to hear the voices of the participants and flow of the conversation.  According to Bendor, this call represented a critical moment in the Red Kite-Oracle negotiations: the call was not going well, Red Kite was expressing frustration that Oracle would not provide certain information, and Oracle was not being clear as to why it could not provide the information.  Bendor spoke up, and she believes that she directed the call into a more productive direction.  (Bendor Decl. ¶¶ 28, 29.)  According to Mercier, Oracle could not provide the sensitive information that Red Kite was seeking with Axiom on the line. (Mercier Decl. ¶ 50.)  Mercier viewed Axiom's participation on the April 10 call a hindrance and not a help.  (Id.)  He testified that the call was the "wrong call to do at the wrong time." (Tr. 612.)  On that call, Red Kite asked whether Oracle was looking for equity financing; Mercier stated that it was.  (Mercier Decl. ¶ 52.)

According to Silver, Bendor's participation on the call was irrelevant.  He already had the information that was provided from the call because of his site visit. (Silver Decl. ¶¶ 31, 32.)  Moreover, he was not prepared to walk away from the deal at that time and, had he left the call without the information he needed, he would have picked up the telephone and asked Eagland for it directly.  (Tr. 665:09–666:15.)  Silver testified that "we were nowhere near worried about the details at that point." (Tr. 666:05–06.)  Having listened to the call, the Court credits Mercier's and Silver's versions of the call and finds that Bendor overstated the assistance that Axiom provided during this call.

As of the April 10 call, Red Kite did not believe that Axiom was acting as a broker of an equity deal between Oracle and Red Kite; Silver believed that Axiom was involved in a parallel effort to raise equity alongside Oracle's efforts with respect to Red Kite. (Silver Decl. ¶ 32.)

After the April 10 call, Axiom's Stober repeatedly requested that Red Kite's Silver send him its term sheet. (Id. ¶ 33.) Silver did so. (Id.) No one at Oracle instructed Silver to send Stober Red Kite's term sheet. (Id.) Silver knew that the first term sheet that he had sent to Stober contained terms that would be unacceptable to Oracle. (Id.) He anticipated that Oracle would negotiate more favorable terms. (Id.)

At the end of April, Crichlow and Eagland had a telephone call that Crichlow recorded. (PX 186.) In that call, which was also played at trial, Crichlow and Eagland discussed Red Kite's propensity for deals with "rich terms," that is, deals that had a high all-in cost for the company. (Tr. 207:21–209:25.) During that call, Eagland referred to a term sheet that would be forthcoming from Red Kite. (Tr. 210:06–09.) At one point, Eagland states in a voice that sounds like advice to himself—not a statement to Axiom—that he (Eagland) should not "shut them [Red Kite] down." (Tr. 210:19–20.) The Court interprets this call as Eagland stating that he should allow Red Kite to make whatever offer it is going to make and take it from there; the Court does not interpret this call—as Crichlow testified that he did—as Eagland stating to Crichlow that "the relationship was ours [Axiom's]." (Tr.

210:23–211:01.)  Indeed, the Court had the call played a second time in open court and believes that Crichlow's interpretation of the call is unreasonable.

After Silver had sent Stober the term sheet, Stober attempted to negotiate its terms with him.  (Silver Decl. ¶ 34; Stober Decl. ¶¶ 20–25.)  Stober had never before negotiated a mine royalty, offtake, or streaming agreement with respect to a mine.  (Tr. 365:04–09.)  Silver found him to be lacking knowledge of the mining industry that he would have expected.  (Silver Decl. ¶ 34.)  Nevertheless, after communicating with Stober, Silver sent Axiom a second term sheet; this one included equity in addition to debt and offtake arrangements.  (Id. ¶ 35; Stober Decl. ¶ 26.)  At trial, Stober conceded that the changes Red Kite made between the first and second term sheet were of a type that Oracle could itself have obtained.  (Tr. 390:14–391:24.)  The Court finds that Silver sent the term sheet to Stober based on a mistaken belief that Stober was entitled to and should receive it;  the Court does not find that any arrangement between Oracle and Axiom provided that Red Kite should send any term sheet through Axiom.

Axiom sent the revised Red Kite term sheet to Oracle in May 2012.  (PX90, at OMC-000440; PX91, at ACM001360.)  This term sheet provided for $35 million in debt and $15 million in equity financing.  (PX90, at OMC-000441–OMC-000442.)  Eagland testified that this term sheet had no bearing on the ultimate deal that Red Kite and Oracle negotiated.  (Tr. 481:11–16.)  Liller stated that he was not interested in this proposal; it was not workable for Oracle, and he dismissed it out of hand.  (Liller Decl. ¶ 23.)  The Court credits Liller's testimony.  The Court found

Liller knowledgeable, serious, forthright, and clear; he did not appear to exaggerate his testimony for effect.  According to Liller, Oracle needed equity, not more debt. (Id.)  While the first Red Kite proposal provided for $50 million in cash with $35 million in liability for Oracle, the final deal negotiated by Eagland and Silver provided for $18.8 million in cash and no required liability.  (Liller ¶ 24.)  Liller characterized the difference between the first Red Kite proposal that Axiom transmitted to Oracle and the final deal that closed as "stark."  (Id.)  Eagland agreed that the final deal was a far better deal for Oracle.  (Tr. 509:12–510:18.)

Silver testified that, at the time of this first term sheet, the deal was still at the very early stages; Red Kite had not yet completed technical due diligence.  (Tr. 679:10–13.)

A little over a week later, Axiom participated in a conference call with Oracle and Red Kite regarding the term sheet.  Thereafter, all communications between Axiom and Oracle relating to Red Kite ceased.  By the end of May or first week of June, it was clear that Axiom played no role in the transaction that Red Kite and Oracle were negotiating.  (See Silver Decl. ¶¶ 39, 40.)  At trial, this was referred to as a period of "radio silence."  (See, e.g., Tr. 368:13, 369:09–24, 370:07–16, 371:19–22.)

The record is clear that Red Kite continued its due diligence throughout the summer of 2012.  (Tr. 705:17–706:09.)  Various terms of the Red Kite-Oracle transaction changed during that period.  (Compare PX90 with PX151.)  Even Axiom conceded at trial that offtake agreements could change frequently.  (Tr. 387:11–21.)

On August 21, 2012, Crichlow met with Eagland.  (Crichlow Decl. ¶ 31.)  At that meeting, Crichlow requested that Eagland update him on the status of the transaction with Red Kite.  (Id.)  Based on a preponderance of the evidence, the Court finds that Eagland never promised Crichlow that Oracle would pay Axiom anything; nor did he state that he viewed the contract as covering the work that Axiom had performed.  At most, Eagland may have stated that Axiom was deserving of something, but that Crichlow should try to work it out with Red Kite directly.  (Id. ¶ 36.)  Crichlow subsequently had a call with Silver in which he suggested that they somehow split the fee; Silver was dismissive of this request.

In any event, the Oracle-Red Kite transaction was still months away from closing at this time.  The transaction did not close until November 2012.  (Silver Decl. ¶ 45.)  The final transaction is significantly different from that which Axiom discussed with Red Kite in May 2012.

It is clear by far more than a preponderance of the evidence that the Agreement between Oracle and Axiom provided that Axiom would be paid for introductions of investors to Oracle—that is, "to the Company."  It is equally clear by far more than a preponderance of the evidence that Axiom did not introduce Red Kite to Oracle.  Discussions had started without Axiom as an intermediary; the first intermediary was Haywood Securities.  (Tr. 617:06–09.)  There is no doubt that Oracle and Red Kite's discussions commenced in the fall of 2011, before Axiom had been retained by Oracle.  By the time that Oracle and Axiom had signed the Agreement, Red Kite had already had a number of communications with Oracle

24

regarding financing, and had already arranged a mine visit. The March 2012 meeting that Axiom arranged between Red Kite and Oracle, which Axiom did not even attend, was neither an introduction nor even necessary.

The evidence does not support the claim that anyone promised Axiom that it would be paid for its efforts with respect to Red Kite. The most that may have occurred was Eagland's ex post statement that he thought that Axiom could try to work out a fee with Red Kite. This statement is by no means a concession that payment was in fact due and owing by Oracle. Indeed, at the time that Eagland and Crichlow had the communication in which this statement or one like it occurred, the Red Kite financing was still two months away from closing. Thus, even under the contract, there could not be a present obligation to make any payment at that time, because the contract only specifies payment at or because of a closing of a securities purchase.

II.    CONCLUSIONS OF LAW

A.    The Contract Claims

The legal issues in this case are straightforward and uncomplicated. They are simply a matter of contract interpretation.

"In order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." Diesel Props S.R.L. v. Greystone Bus.

25

Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011.)  Because Axiom's actions with respect to Red Kite did not fall within the Agreement, its breach-of-contract claim fails.

As a matter of law, a contract is interpreted according to its plain words and meaning unless ambiguous.  "In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous.  Ambiguity is determined by looking within the four corners of the document, not to outside sources.  When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms."  Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011) (citations and internal quotation marks omitted); see also W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990) ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.").

In interpreting a contract, courts "should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby."  Kass v. Kass, 91 N.Y.2d 554, 566 (1998).  Additionally, a "contract must be construed according to the custom and use prevailing in a particular trade."  Seven Star Shoe Co., Inc. v. Strictly Goodies, Inc., 657 F. Supp. 917, 921 (S.D.N.Y. 1987).

In the event of ambiguity, the Court may refer to extrinsic evidence in order to determine the intent of the parties.  A contractual term suffers from ambiguity if

it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 617 (2d Cir. 2001).  Under such circumstances, "reference to extrinsic evidence provides guidance to the parties' intent." Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co., 979 F.2d 268, 274 (2d Cir. 1992).

Here, the sole disagreement between the parties is whether the Agreement encompasses more than initial introductions to investors and instead extends to include initial introductions to a particular investment opportunity.  At the summary judgment stage, principles of contract interpretation led this Court to deny the motion in order to consider whatever extrinsic evidence the parties (particularly Axiom) might present regarding the concepts of "introduction," the circumstances under which "Private Placement Fees" should be paid, and the meaning of the role of a "finder."  The Court finds that the extrinsic evidence confirms Oracle's interpretation of the Agreement, not Axiom's.

As an initial matter, Bendor was the drafter of the original Agreement.  (Tr. 97:12–15.)  She cut-and-pasted the Agreement from another document, created by someone else at Axiom with whom she had never had a conversation.  (Tr. 112:21–113:22; 114:04–16.)  She included language relating to finding investors and the phrase "introductions to the Company," yet she never spoke to anyone about what they meant.  She believed, the Court finds wrongly, that the Agreement would cover

Axiom's role as a more traditional placement agent.  In contrast, Oracle's witnesses were clear as to what they understood the term "introduction" to mean, why it was in the Agreement, and its importance to Oracle.  The Court finds by a preponderance of the evidence that Oracle explicitly intended that those terms mean just what they say—that introductions "to the Company" were intended to, and did, mean just that.  The testimony of Langer, Mercier, and Eagland is consistent and clear on this point.  (See, e.g., Langer Decl. ¶¶ 29, 30; Tr. 289:09–18, 291:11, 323:22–24.)

The law does provide that, in the case of an ambiguous contractual term, the conduct of the parties can provide indications of intent.  See, e.g., Robinson v. Robinson, 440 N.Y.S.2d 127, 129 (App. Div. 4th Dep't 1981).  Axiom argues that Oracle's conduct here indicates that it believed that "introductions to Company" in fact meant something other than what it says.  In connection with the motion for summary judgment, the Court questioned whether that could be so.  (See ECF No. 48 at 3.)  However, now that all of the evidence is in, the preponderance of the evidence is on the side of Oracle's witnesses, who testified uniformly that they understood the phrase "introductions to Company" to mean just that.  Accordingly, this Court need proceed no further to determine the meaning of that phrase.  See Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) ("As a general matter, the objective of contract interpretation is to give effect to the expressed intentions of the parties . . . .") (emphasis in original).

28

However, even considering the evidence as a whole, including the conduct of the parties, the Court does not find that the parties intended a different meaning.

Oracle's witnesses testified that the word "introduction" was important to them and that they intended it to mean an introduction to a new investor.  (<u>See, e.g.</u>, Langer Decl. ¶¶ 29, 30; Tr. 289:09–18, 323:22–24.) This is consistent with the disappointment that Mercier and Langer expressed on March 12 when they asked Axiom to set up meetings in Denver and Axiom set them up with Red Kite, an entity with whom they had already met.  (<u>See, e.g.</u>, Mercier Decl. ¶ 40; <u>see also</u> Tr. 311:05–15, 612:14–613:11.)  Their contemporaneous emails to Axiom immediately put Axiom on notice that they knew Red Kite already; Bendor's email regarding Silver indicated that she knew he had already visited the mine.  (<u>See, e.g.</u>, Tr. 107:13–16, 186:21–188:16; DX27, at OMC-000028–OMC-000029; Mercier Decl. ¶¶ 41–43; Langer Decl. p. 8 ¶¶ 2, 4.)

In addition, Oracle witnesses provided a reasonable and credible explanation as to why they understood it would be in Axiom's interest to try to further a Red Kite transaction: such a transaction would lend credibility to the overall project and make it easier to attract other investors.  (<u>See, e.g.</u>, Liller Decl. ¶ 14, Mercier Decl. ¶ 45, Tr. 618:15–19, 302:22–303:05.)  That this did not occur does not mean that this expectation was not a reasonable one.

The evidence that Red Kite and Oracle were in active and detailed discussions regarding a financing arrangement is overwhelming.  (<u>See, e.g.</u>, Silver Decl. ¶¶ 39, 40, Liller Decl. ¶¶ 23, 24; Tr. 368:07–22, 481:11–16, 509:12–510:18,

705:17–706:09; compare PX90 with PX151.)  The fact that Oracle did not tell Axiom

to "stop" its communications with Red Kite does not tip this evidence to the other

side of the scale.

> B.    Quasi-Contract Claims

The law is clear that, where a contract governs the parties' relationship,

quasi-contract claims will not lie.  Yonkers v. Otis Elevator, 844 F.2d 42, 48 (2d Cir.

1988) (explaining that quasi-contractual "relief is unavailable where an express

contract covers the subject matter"); Clark-Fitzpatrick v. Long Island R.R. Co., 70

N.Y.2d 382, 388 (1987) ("The existence of a valid and enforceable written contract

governing a particular subject matter ordinarily precludes recovery in quasi

contract for events arising out of the same subject matter.") (citations omitted).[9]

It is clear that the Agreement governed the parties' relationship.

Accordingly, Axiom's claims for unjust enrichment and quantum meruit are without

merit.  This principle applies even though it means that Axiom recovers nothing for

the work that it performed in connection with its engagement by Oracle.  That is

the result not of unfairness, but rather of the terms of the contractual arrangement

between the parties that provided for payment only under limited circumstances.

Put another way, when a contract provides for payment only under certain limited

circumstances and not others, the fact that work is performed and not compensated

is reflective of the bargain the parties struck and not a surprising or inequitable

occurrence.  See, e.g., Libra Bank Ltd. v. Banco Nacional De Costa Rica, S.A., 570 F.

---

[9] The Court "may analyze quantum meruit and unjust enrichment together as a single quasi contract claim."  Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005).

Supp. 870, 893 (S.D.N.Y. 1983) ("[W]here there is no inherent ambiguity, courts should not, under the guise of judicial construction, reach an artificial interpretation in order to relieve a party from an improvident bargain.").

Thus, the fact that Axiom's work on Red Kite fell outside the parameters of what the parties agreed would be compensable does not then convert such non-compensable work into a claim for quantum meruit.  The scope of the contract was all of the work that Axiom performed in connection with finding investors for Oracle; the parties agreed that Axiom would be paid for work that constituted initial introductions and not others.  The Red Kite work fell into that non-compensable category.

Further, even assuming that the Agreement did not preclude plaintiff's quantum meruit claim, plaintiff's claim would fare no better.  "In order to recover in quantum meruit, New York law requires a claimant to establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."  Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 69 (2d Cir. 2000).  The Agreement between the parties was clear, and the sophistication of the parties accepted: it simply defies credulity that Axiom provided its services in good faith.  The Court finds otherwise.  While Oracle did not say, "Stop, you will not be paid for Red Kite" in so many words, many business situations are less than clear, and parties are expected to act reasonably and in conformance with expectations.  Here, the evidence is clear that Oracle informed

Axiom clearly and on multiple occasions that it had a prior relationship with Red Kite, that Red Kite had even visited the Oracle mine prior to Axiom's involvement, and that Silver had already had communications with Red Kite.  (See, e.g., Tr. 107:13–16, 186:21–188:16; DX27, at OMC-000028–OMC-000029; Mercier Decl. ¶¶ 41–43; Langer Decl. p. 8 ¶¶ 2, 4.)

Axiom could not have understood that Red Kite fell within the four corners of the contract, or that it could in good faith expect compensation for its work involving Red Kite.  To the extent that Axiom thought that it could stretch the contract to cover that which it did not, it bet incorrectly.

III.   CONCLUSION

For the reasons set forth above, the Court finds in favor of Oracle as to all claims.  Judgment is entered simultaneously herewith by separate order. The parties are to bear their own costs.

SO ORDERED.

Dated:   New York, New York
         March 25, 2014

                                          KATHERINE B. FORREST
                                          United States District Judge

32